## RUTLEDGE & KILPATRICK REALTY COMPANY, Respondent, v. GARTSIDE et al., Appellants.

### St. Louis Court of Appeals, January 7, 1908.

1. **ASSUMPSIT: Instruction: Value of Services.** In an action for compensation for services rendered by the plaintiff to the defendants in effecting a settlement of the defendants' business, an instruction telling the jury that in determining the value of the plaintiff's services, they might take into consideration the skill "possessed" by plaintiff, was inaccurate in not requiring the jury to find the skill was employed in the service; but it was not reversible error where the evidence showed conclusively that the plaintiff did exhibit skill and efficiency in the performance of the service.

2. **PRACTICE: Ratification: Pleading: Instruction.** In an action for compensation of services rendered by plaintiff to the defendants in effecting a settlement of the defendants' affairs with a debtor, it was shown that a provisional contract of settlement was first made and afterwards a final settlement effected by plaintiff with such debtor, which the defendants entered into with full knowledge of all the facts and the terms of the settlement, and the defendants took and retained the fruits of the settlement. Defendants filed a counterclaim for damage on account of the unauthorized surrender of certain assets by the plaintiff in effecting the settlement. *Held*, it was not necessary for the plaintiff to plead a ratification of such alleged unauthorized act in order that the jury might find for the plaintiff on the counterclaim; the theory of ratification was not appropriate under such facts.

3. ————: **Instruction: "Preponderance of Evidence:" Definition.** An instruction stating that the burden of proof was upon the plaintiff to prove his case to the jury's satisfaction by a preponderance of the evidence, and defining a preponderance of the evidence to mean "the greater weight with respect of credibility" was not erroneous.

4. **ASSUMPSIT: Value of Services: Judgment and Skill: Instruction.** In an action for the value of services rendered by plaintiff to defendants in effecting a settlement of the defendants' business with a debtor, an instruction authorizing a verdict for the defendants if the plaintiff did not possess and use judgment and skill in the transaction of the business, in consequence of which the settlement effected was prejudicial to the defendants, was properly refused. The plaintiff in such case would only be liable for the loss actually suffered by the defendants on account of his lack of skill, which would be deducted from the value of his services.

Appeal from St. Louis City Circuit Court.—*Hon. Walter B. Douglas,* Judge.

**AFFIRMED** *si.*

*Charles S. Reber* for appellants.

(1)     Instruction number 4 given upon plaintiff's request by the court, is erroneous.     1. It ignores material and controverted facts in the case.     Bank v. Murdock, 62 Mo. 73.     2.     It is unfair and misleading.     It in effect tells the jury that in considering the value of plaintiff's services they need only take into account the "skill required to perform the same."     It fails to require the jury to find that the requisite skill was actually employed in the performance of the work.     West v. Martin, 31 Mo. 375; Carpenter v. Blake, 75 N. Y. 12.     (3)     It introduces a false standard of the skill plaintiff was required to possess.     Schade v. Gehner, 133 Mo. 352; Price v. Ganun, 11 Misc. 74, 155 N. Y. 670.     (2)     Instruction number 6 given by the court at plaintiff's request is clearly erroneous.     It submits to the jury the question of ratification and that plea is not made in the pleadings.     Wade v. Hardy, 75 Mo. 394; Currier v. Lowe, 32 Mo. 203.

*Thomas G. Rutledge* for respondent.

GOODE, J.—Plaintiff is an incorporated company engaged in the real estate and financial business in the city of St. Louis, and in acting as financial and business agent for clients in negotiating loans and settlements and collecting money.     This action was instituted to recover compensation for services rendered defendants in effecting the settlement of an extensive indebtedness they held against Joseph A. Duffy.     The two defendants are sisters and appear to have possessed a fortune, but to have been lacking in experience and knowledge of

business affairs. One of them so testified. Duffy was their brother-in law and had been in charge of their affairs and an extensive borrower of money from them. They made him various loans at different dates which are not given, but by September 20, 1904, when plaintiff was employed to effect a settlement with him, these loans amounted to between $109,000 and $110,000, and were supposed to be secured by deeds of trust on real estate in the city of St. Louis, sufficient in each instance to make the loan safe. In fact a considerable portion of the indebtedness was not thus secured. It is true each loan purported to have a deed of trust back of it; but in some instances there was no title to the property in the grantor who executed the security, and in others there were such heavy prior incumbrances that defendants' security was worthless. Duffy was in every instance the borrower, but he did not always give his own notes for the debt. There were notes in the names of these makers: Erker, Jacobs, Weber, Jordan, O'Connell, Newman, Wellington R. E. Company, and perhaps others. The defendants did not know, until the fact was discovered and told to them by plaintiff, that Duffy was the borrower in the instances where the notes and deeds of trust were executed by other persons; and, as stated, in some of those instances there was no title in the borrower to the property which had been mortgaged to secure the loan. About September 20, 1904, the defendants put in plaintiff's charge for foreclosure, a deed of trust executed by one Newman. The defendants had no certificate of title to the property covered by the deed of trust and in other respects the loan appeared to be badly secured. Robert Rutledge, general manager of the plaintiff company, called their attention to these circumstances, and asked them if they had any more such papers. The conversation led to defendants placing in the hands of plaintiff for attention during the latter part of September and early in October,

1904, the documents and papers relating to all the loans made to Duffy, or nominally to other persons when he was the real borrower. The evidence shows these papers and securities were in disorder and that defendants knew but little about their business relations with Duffy. In fact Mr. Rutledge got the papers from them from time to time, as his investigation of some loan would lead him to believe there were still others. Defendants kept minutes of their transactions with Duffy on loose scraps of paper and in a wholly irregular way. However, as said, all the indebtedness of Duffy was finally put into Robert Rutledge's hands for settlement and collection. He took the matter up and appears to have conducted it with skill and diligence, running down the titles to the different pieces of property on which defendants had deeds of trust, or supposed they had, ascertaining what titles were good and what were not, whether there were prior incumbrances, and in general doing all things necessary to ascertain the exact condition of each loan and how it was secured. In the course of this work he procured abstracts of title from a firm of title abstracters, sometimes certificates of title and sometimes neither a formal abstract nor certificate, but a pencil memorandum sufficient to enable him to investigate the security. Mr. Rutledge gave a large portion of his time to the defendants' business from the date when their matters were first placed in his charge (September 20, 1904) to the execution of the first contract of settlement between defendants and Duffy, on October 26, 1904. As we gather, the defendants held against Duffy thirty or more notes and other evidences of debt, growing out of transactions which extended over ten years. There were thirty of forty pieces of real estate involved in the loan transactions and plaintiff had to investigate the titles to all these pieces. The defendants supposed Duffy was in good circumstances, but it developed that he was greatly in debt and was

on the verge of bankruptcy. Indeed, he was threatening to go into voluntary bankruptcy. After ascertaining the amout of the indebtedness, getting together the notes and other evidences of debt and securities the defendants held, and posting himself regarding the titles of the various properties involved, Mr. Rutledge began a negotiation with Duffy for a settlement. The preliminary investigations and the negotiation with Duffy were continued from September 20 to November 10, 1904. During this period Rutledge had many interviews with the defendants themselves regarding their business and laid before them such knowledge as he had derived from his investigations. He likewise had numerous interviews with Duffy and the latter's attorney, Mr. E. W. Banister, in the negotiation for a settlement of the indebtedness. These meetings were sometimes of a disagreeable and contentious character. Duffy would insist many of the claims of defendants were wrong; that he had paid certain notes held by them and preferred against him; that others of the notes were given as renewals and he was entitled to credits which he had not received. It not infrequently turned out he was in the right about those differences. In truth when plaintiff was employed the defendants knew little about the state of their business with Duffy or how much he owed them. Another difficulty in the settlement was that the only resource Duffy had for paying was to turn over to defendants pieces of real estate which he held equities in, and he wished to appraise the equities at exorbitant prices in the settlement. Disputes over the prices at which the properties should be taken by defendants ran high and continued for days, Rutledge insisting on lower valuations than Duffy would concede and the latter threatening to go into bankruptcy if his figures were not accepted. During the course of the negotiation the rental value of the properties, the prices of them and all the details of the business were laid before

defendants. Under date of October 26, 1904, a written contract, which was executed about November 10th, was entered into between the parties, by which four tracts of land were conveyed by Duffy to defendants at certain valuations. All these tracts were improved with buildings and yielded rent. The first one was on Forest Park Boulevard, and had a frontage of 125 feet, which was taken at a valuation of $55,000, subject to an incumbrance of $19,000, leaving an equity of $36,000. The second tract was 225 feet on Finney avenue. It was taken at a valuation of $60,000, subject to an incumbrance of $21,000; leaving an equity of $39,000. The third was 185 feet on Fairfax avenue and was taken at $40,000, subject to an incumbrance of $13,500; leaving an equity of $26,500. The fourth was a tract on Cook avenue taken at $22,500, subject to an incumbrance of $11,000; leaving an equity of $11,500. There were some other provisions in the contract which need not be stated, but it was provided that if, on a careful auditing of the accounts between the parties, it should be found the value of the several parcels of land, less the total amount of incumbrances on them, did not equal the indebtedness of Duffy to defendants, he should make up the deficiency, either by conveying real estate or a payment in cash; and if it should be found the net value of the parcels of real estate was in excess of Duffy's indebtedness, defendant should pay the difference. The auditing was to occur as soon as the deed to the real estate should be ready for delivery. After the preparation of this agreement, but before its execution, a new indebtedness of $6,000 or $6,500 was discovered and this required a rearrangement of the settlement. The defendants took the property subject to the incumbrances and the arrearage of taxes thereon, which arrearages amounted to about $7,000. Subsequently there was a re-auditing of the various transactions and another contract entered into which altered the first one in some

details and finally settled the differences between the parties. This contract was executed January 19, 1905. It recited the previous contract of October 26, 1904, and that the latter provided for a further valuation of the property to be conveyed to defendants, and an auditing of the accounts between them and Duffy; that such accounting having been had, it was found the values of the property turned over to defendants did not differ materially from the agreed values of the first contract. Some details of the first agreement not material to the present controversy, were altered and the January contract was declared to be a final settlement of all matters in dispute between the parties. It seems the alterations from the October contract were largely in favor of Duffy, as it turned out he was entitled to credits which had not been allowed him in the October settlement. It was in consideration of this fact that some shares of stock in two corporations were transferred to Duffy by defendants and an equity in a piece of real estate conveyed to his wife. In the settlement Duffy's indebtedness was fixed at $109,982.42; divided as follows: to Julia Gartside, $33,450.82; to Emma Gartside, $76,531.60. As the equities in the properties aggregated, according to the appraised values, more than the indebtedness, three notes secured by deeds of trust, were turned over by defendants to Duffy, to-wit, notes and deeds of trust designated as the O'Connell, Jacobs and Erker loans, and aggregating $2,900. As has been stated, the contract of January, 1905, altered in some particulars the one previously made, on account of later discoveries of the state of business between Duffy and the defendants. We have stated the evidence according to the testimony for the plaintiff, but there was not much disagreement among the witnesses, or between the parties, except on three points: one was the value of the equities in the properties turned over to defendants by Duffy, another was as to the authority of plaintiff to surrender to Duf-

fy, the O'Connell, Jacobs and Erker notes, and the third was as to the reasonableness of plaintiff's charge. The testimony for the plaintiff tended to show the value of the equities was as already said, upwards of $113,000; whereas the testimony introduced by defendants put their value lower. The overwhelming weight of the testimony, if not all of it, is that defendants expressly authorized the three notes mentioned to be turned over to Duffy, and the evidence is conclusive that they knew it had been done when they accepted the fruits of the settlement. Indeed, Duffy offered to undo the settlement after it had been consummated, but defendants refused his offer and resolved to hold what they had received. It should be stated in this connection that not only were the defendants advised all along of what plaintiff was doing, and of the terms of settlement, but they took independent advice on the subject, consulted another attorney about the settlement and other persons about the values of the real estate they were accepting. According to Miss Julia Gartside's testimony, about the relinquishment to Duffy of the Erker, O'Connell and Jacobs notes in order to equalize the indebtedness of Duffy and the equities he was to convey to defendants, when Mr. Rutledge first informed her the notes had been surrendered, she said the act was done without authority and ordered Rutledge to get the notes back. He started to leave his office to get them from Bannister or Duffy, when his associate, Mr. Kilpatrick, said to Miss Gartside, that he disliked to see her and her sister lose their money and advised her to consult an attorney before she repudiated the arrangement for a settlement. On this suggestion she took counsel with Paul F. Coste, an attorney, who strongly urged her to stand by the arrangement Rutledge had made, including the surrender of the three notes, as otherwise there would be protracted litigation with Duffy which would have to be heard by a referee. Miss Julia Gartside swore that after re-

ceiving this advice she did not further insist on a return of the notes, but indorsed them to Duffy, which before she had refused to do. The evidence shows conclusively that Duffy was insolvent. He owed perhaps $200,000 to persons other than defendants. The evidence shows, too, the settlement effected by plaintiff, resulted in defendants getting all the property Duffy owned for what he owed them. The attorney with whom defendants consulted between the time of the first contract in October, and the final one in January, advised the defendants to go forward with the settlement, with which, it seems at that time they felt dissatisfied. After the business was closed, defendants offered to pay plaintiff $500 for its services, but plaintiff demanded $1,500 and would take no less. There is testimony that plaintiff agreed to waive its charge in consideration of being allowed to attend to defendants business, but this is disputed. The petition is in two counts, the first one for the reasonable value of the services and the other on an account stated. There is evidence tending to support both counts. Much testimony was adduced that plaintiff's services were worth a great deal more than $1,500, the amount demanded, and beyond question the issues on both counts were for the jury. The verdict was in favor of plaintiff on the first count of the petition for $1,400, with six per cent interest from December 3, 1904, on the second count in favor of defendants and on defendants' counterclaim in favor of plaintiff. It should be stated that this counterclaim was preferred to recover the value of the three notes alleged by defendants to have been relinquished to Duffy without authority. Inasmuch as one of the defendants herself testified the notes were voluntarily relinquished after the defendants had taken independent advice about doing so, we do not perceive any basis for the counterclaim but it was left to the jury by the court below. The preponderance of the evidence is in favor of plaintiff on all

the issues and the verdict is satisfactory.    Plaintiff rendered defendants a most valuable service in securing the settlement of Duffy's indebtedness, which was in an extremely precarious state; and whether the equities they received in payment were worth as much as they were estimated at in the settlement, or not, suffice to say defendants got all Duffy had, to the exclusion of his other creditors, and what they got was of large value in any view of the evidence.    This result was due to the meritorious services of plaintiff, through its officer, Mr. Robert Rutledge.    We do not see how the settlement of defendants' affairs with Duffy, complicated as they were and threatening a heavy loss, could have been conducted so as to yield a better result.    The defendants were not imposed on or taken advantage of in any way by plaintiff, but the attention given to their business was marked with fidelity and diligence.

Certain rulings on instructions are complained of on this appeal.    One of the complaints is that the court instructed the jury that in determining the value of plaintiff's services, the nature of the employment, magnitude of the settlement and amount of indebtedness involved, the skill and time required of plaintiff's officer in preparing for the settlement, and in the negotiation leading to its consummation, so far as skill was possessed by plaintiff, together with all the facts and circumstances, should be taken into consideration.    The criticism of this instruction is that it authorized the jury to consider the skill required to perform the services, without reference to whether skill was brought to bear in its performance, or not.    What the instruction means is that in determining the value of plaintiff's services, the jury should take account of the skill which plaintiff had used in the performance; and such consideration might result in defendants' favor as well as plaintiff's, if, perchance, the jury thought proper skill was not exhibited in handling the business.    The word

"possessed" in the phrase "so far as possessed by plaintiff," was inapt and "used" or "employed" would have been a better word. But this flaw was very unlikely to mislead the jury. As the evidence admits no conclusion save that skill and efficiency were exhibited by plaintiff, the judgment ought not to be reversed because of a slight inaccuracy. The court instructed the jury that even though they believed plaintiff was not authorized prior to the first settlement, to turn over to Duffy the O'Connell, Erker and Jacobs notes, aggregating $2,900, yet if the jury further believe that after defendants learned of said fact, they agreed to the settlement and accepted the fruits of it, or did certain other predicated acts, defendants were not entitled to recover on their counterclaim. The objection to said charge is that it let the jury pass on the ratification of a previously unauthorized act; whereas ratification was not pleaded by plaintiff. The theory of a ratification by defendants of the surrender of said notes is as inappropriate under the evidence as the counterclaim asserted in consequence of their surrender is baseless. The defendants in person indorsed the notes to Duffy and consented to his having them after they knew all the facts of the settlement. Moreover the settlement of October, 1904 (executed November 10th) in which the notes were surrendered, was provisional and not final, and in the final settlement defendants abode by their previous action, and did so after Duffy had offered to rescind the entire settlement and resume the negotiation. The defendants executed the settlement with full knowledge of all its terms and accepted the fruits thereof and took possession of and retained the property conveyed to them by Duffy. The assignment of error based on the submission to the jury of the question of ratification is overruled. The court instructed in substance, that the burden of proving plaintiff's case and what the services rendered were reasonably worth, rested on plaintiff and it

was bound to prove those matters to the jury's satisfaction by a preponderance of the evidence; that by preponderance of the evidence was meant its greater weight with respect of credibility. We find no fault with said instruction, though it is criticised. Complaint is made of the court's refusal to instruct that plaintiff, in undertaking to act as agent for defendants, impliedly represented that it (plaintiff) possessed reasonable skill and knowledge in the business of the agency and would use them in attending to defendant's affairs, and if the jury believed plaintiff, or its officer who transacted defendants' business, failed to possess such knowledge and skill, or to conduct the matter with reasonable judgment and care, and in consequence a settlement was effected which was prejudicial to defendants' interests, plaintiff could not recover. The settlement in all its terms was fully approved by defendants after they thoroughly understood it and had taken independent counsel. Hence it is dubious if any instruction predicating a lack of skill and judgment could properly have been given. Certainly the one asked could not; for it cut plaintiff off from a recovery if it did not use skill in the business and damage resulted to defendants. At most plaintiff would be liable only for the amount of loss suffered by defendants from plaintiff's lack of skill and would not, in the absence of bad faith, be deprived of all compensation, if its services were worth more than the amount of the loss. [Wills v. Wolff, 7 Mo. App. 593.]

We have gone over this voluminous record with care, but find no assignment of error which possesses merit, except that the verdict is excessive in that the interest was computed on plaintiff's demand from December 3, 1904, instead of from November 15, 1905, as the court directed. This error occurred from a misapprehension by the jury of the court's instruction. The matter was urged in the motion for new trial. If the

plaintiff will remit the excess of interest in ten days from the delivery of this opinion the judgment will be affirmed; otherwise it will be reversed and the cause remanded.    We hold that under the circumstances of this case it is but just that the true amount of the judgment, less the excess of interest found by the jury, should bear interest from the date it was rendered.    All concur.